BLEI et al. v. ASHER.

(Circuit Court of Appeals, Sixth Circuit. January 9, 1925.)

No. 4091.

1. Sales ⟜168(2)—Buyer held bound to inspect and receive partial deliveries.

Under contract to manufacture and deliver 500,000 barrel staves, buyer held required to inspect and receive the staves when tendered for shipment in reasonable quantities in carload lots.

2. Sales ⟜181(13)—Evidence held to show failure to inspect promptly.

In buyer's action for seller's breach of contracts to manufacture and sell barrel staves evidence held to show seller failed to inspect staves promptly when delivered at railroad for shipment, and that buyer never accepted proposed modification providing for inspection at destination.

In Error to the District Court of the United States for the Eastern District of Kentucky; Andrew M. J. Cochran, Judge.

Action at law by George F. Blei and Herman Katz, partners as Blei & Katz, against A. J. Asher. Judgment for defendant, and plaintiffs bring error. Affirmed.

S. S. Willis, of Ashland, Ky. (James H. Jeffries, of Pineville, Ky., on the brief), for plaintiffs in error.

Martin T. Kelly, of Pineville, Ky., for defendant in error.

Before DENISON, MACK, and DONAHUE, Circuit Judges.

MACK, Circuit Judge. The question presented by this writ of error is whether the court erred in directing a verdict for the defendant and in abusing his discretion in refusing to grant a new trial.

The action was for the alleged breach by the defendant of two contracts of sale. Under the first contract, dated July 19, 1919, defendant sold to William Aders 500,000 oil barrel staves for the sum of $55 per thousand, 250,000 to be delivered to the railroad by October 20, 1919, and the remainder by December 25, 1919. Under the second contract, dated August 15, 1919, the defendant sold to Aders a further 500,000 oil barrel staves for the sum of $60 per thousand, to be delivered by June 1, 1920. While the contracts were made with Aders as vendee, it is admitted that Aders was acting for and in behalf of the plaintiffs, to whom he assigned both contracts.

The first contract provided as to inspection and advancements as follows:

"It is also understood that these staves are to be graded in accordance with the Cooper's industries specifications, and that Aders himself will inspect said staves if possible, but in case Aders cannot inspect said staves himself then he will have the right to send an inspector to inspect said staves. Those staves are being cut at Camp Branch on the left fork of Straight Creek, and will be delivered on cars at or near Heyburn, Ky. * * *

"The party of the second part has agreed to advance fifty (50%) per cent. on said staves as often as they are sawed and stacked on said mill yard, and as often as they are one hundred thousand cut and stacked on mill yard, and when such advancement is made to the extent of one hundred thousand and to the extent of an additional one hundred thousand that he will execute a bill of sale on receipt of such advancement and second party may mark up staves, and so continue until the five hundred thousand are cut and delivered to second party, as per this contract.

"The remainder to be paid when loaded on cars at shipping point. * * *

"The first party agrees to cut staves and pile carefully to fill this contract from timber at Camp Branch now being cut and sawed and to fill the contract before cutting and sawing any staves for any other parties."

The second contract contained no express provision relating to inspection, but provided:

"Second party agrees to pay for said staves $60.00 per thousand, one-half of said amount to be paid as the staves are sawed and cross-piled as often as 100,000 are sawed and cross-piled on the mill yard.

"First party having heretofore sold to second party 500,000 staves, contract executed for same July 10th this year. First party agrees to deliver same total delivery by December 25th this year. First party believes he can deliver part of this contract for 500,000 this year. Second party agrees to receive and ship as often as first party is prepared to load two or three cars or more on this contract, and first party agrees to deliver all staves mentioned in this contract by or before June 1, 1920.

"First party agrees to operate whatever mills he sees fit to operate or all of them on his contract with second party of July 10, 1919, and until this contract is filled before cutting staves for other people, and when first party begins delivering staves on this contract the remaining one-half the money here provided for is to be paid for as often as cars are loaded. The prices provided for herein are f. o. b. cars shipping point.

"When second party takes up and advances money on any number of staves on mill yard first party agrees to sign up bill of sale for same if second party desires it done."

Defendant denied liability because of plaintiffs' prior and substantial breach in failing to inspect and approve the staves as required by the contract.

[1] There can be no question but that under the second contract the plaintiffs were obligated "to receive and ship as often as first party (the defendant) is (was) prepared to load two or three cars or more." Without deciding whether the express provision of the second contract must be regarded as incorporated by reference into the first, or whether if, as is alleged by the defendant, this express provision was omitted from the first contract by mere inadvertence, the defendant could now claim the benefit of such provision, we have no hesitation in finding that the plaintiffs were bound to receive and ship as often as defendant was prepared to load reasonable quantities in carload lots. What the parties themselves specified in the subsequent contract as to the minimum quantities to be inspected is strong evidence as to what in fact was a reasonable quantity under the circumstances. The terms regarding advancements and shipments all indicate that the contract was to proceed throughout its parts in installments. The fact that the defendant was obligated to deliver only certain quantities by specified dates may have given him the option to deliver in larger or smaller installments during the contract period, but it did not permit the plaintiffs to hold off inspection and acceptance of the staves after they were ready for delivery at the railway stations in reasonable carload quantities. When staves sufficient to fill several cars had been delivered at the railway stations, plaintiffs were, under the terms of the first as well as the second contract, obligated to inspect and accept the same before the defendant could be held to be in default for not making further deliveries.

[2] In an opinion refusing a new trial the court below carefully reviewed all the evidence presented. That review clearly shows that the plaintiffs did fail to inspect promptly as they were obligated to do under the contracts.

Plaintiffs admit that at the end of October, 1919, 175,000 staves, which, figuring 12,500 staves to a car, would be approximately 14 carloads, were awaiting inspection, and that by the end of December 235,000 staves had been hauled to the railway. According to plaintiffs about 29,000 more were hauled to the railway in February, 1920; about 22,000 more in April; about 9,500 in

October; about 36,000 in November; and about 28,500 in December. In all about 360,000 staves were delivered and shipped under the first contract. The staves were shipped out by the plaintiffs as follows: About 235,000 in December, 1919; about 30,000 in February, 1920; approximately 31,500 in October; and 64,500 in December. No staves were actually taken under the second contract, although bills of sale covering the entire 1,000,000 staves to be delivered under the two contracts were made out and accepted, and one-half the contract price paid thereon, as provided by the contracts, as the staves were sawed and stacked in the mill yard in lots of 100,000.

It is true that the defendant, during the autumn of 1919, waived prompt inspection owing to the illness of Ader's little son. But such waiver served, at best, only to postpone the execution of the contracts on both sides; it did not oblige the defendant to make delivery of all the staves within the contract period. Any waiver made or indulgence granted was not intended in fact, and did not in law, serve to impose a more onerous burden upon the defendant and to oblige him to finance the balance of the contracts wholly upon his own resources, apart from the half purchase price paid as the staves were sawed and stacked, when in ordinary course he had a right to expect full payment for the staves delivered to the railway station in carload lots in condition to pass inspection. We agree with the district judge that, considering the failure of the plaintiffs to inspect promptly in the fall of 1919, defendant cannot be deemed to have tendered an insufficient quantity down to the end of April. Nor can the contract of the defendant, made in December, 1919, to sell 100,000 staves to a third party be regarded as a breach of the defendant's obligation to the plaintiffs in view of the plaintiffs' failure at that time promptly to inspect and accept the staves at the railway.

In the latter part of April the defendant advised the plaintiffs that he had two full carloads of staves ready and would be glad to load them out of the way. The defendant received no direct reply, but the suggestion was made to him that, if he would ship to the plaintiffs' customers and permit inspection to be made at destination, the plaintiffs would pay him $2 per thousand in addition to the contract price. Upon his failure to accept this suggestion the plaintiffs raised the point for the first time that they were not obliged to inspect so small a quantity as two cars, and that the defendant must

have the entire balance of 200,000 staves then owing on the first contract ready for shipment before they would make inspection. In their subsequent correspondence plaintiffs contended defendant was obligated to have 700,000 staves at the railway by June 1, 1920; 200,000 being the balance due on the first contract, and 500,000 being the amount due under the second contract. It should be noted that the plaintiffs recognized no duty to inspect anything less than the whole amount remaining undelivered under the contracts. It was not a question of a few thousand staves more or less being a reasonable quantity for inspection. The defendant replied on June 2d that the 700,000 staves were not at the railway station, but that the railway was complaining about the 30,000 to 40,000 staves that were there awaiting shipment. The defendant further informed the plaintiffs that he was cutting the last 100,000 staves under the second contract, and, as it was after June 1, 1920, the limit of time for delivery called for by that contract, he inquired whether they would take them. The plaintiffs replied, complaining that all the staves were not at the railways, but urging that they be brought there immediately, and again suggesting that defendant accept $2 per thousand more than the contract price and accept inspection that plaintiffs' customers might make at destination. On July 31, 1920, the plaintiffs accepted bill of sale for the final 100,000 staves under the second contract, thus clearly obligating themselves to accept them if delivered within a reasonable time thereafter. Whether or not the plaintiffs intended to waive all claim for damages for alleged late deliveries we need not decide. The correspondence down to this date and beyond does reveal requests for further deliveries under both contracts. We have already indicated our view that because of their failure promptly to inspect the carload shipments then ready for delivery the plaintiffs had theretofore no claim for damages. Indeed, as the trial court indicated, it might be urged that their continued failure was a breach on their part entitling the defendant to claim damages, and, if he wished, to refuse to go on with the contracts.

In any event, on July 30, 1920, defendant wrote the plaintiffs complaining of the difficult circumstances under which he then labored in bringing the staves to the railway, and requested $5 per thousand more on the staves yet to be hauled. The plaintiffs replied on August 4th, stating that they were prepared to grant this request upon certain

conditions, including the defendant's acceptance of customers' inspection at destination and the shipment of the entire 700,000 staves still due on or before October 31st. The plaintiffs requested the defendant to sign his acceptance on the bottom of the letter, which was written in duplicate, if it was acceptable to him. The defendant replied, on August 11th, expressing his appreciation of the proposal with reference to the additional $5 per thousand, and stating that, if they had given him to January 1st or even December 20th, it was likely he would have accepted and gone into the struggle. On August 13th the plaintiffs telegraphed that defendant should change the letter to read December 15th. In a letter written on August 24th defendant stated that referring to their letter and telegram he had changed the time in which to deliver the staves to December 15th. He alluded to the rains, but said he was preparing to start the haul. He promised to write fully a little later, but said he thought they could get ready to ship; that he expected to load a car a day, but they would have to be loaded and shipped as hauled, as there was no place to store them at the railroad. Although defendant did not return the letter of the plaintiffs with his acceptance, his reply taken alone might, under some circumstances, possibly be construed as an acceptance of the plaintiffs' proposal, modified as to the time of delivery. The court below appeared to be of the opinion that the plaintiffs' proposal called for a particular form of acceptance, to wit, the signing of the acceptance clause at the bottom of the plaintiffs' letter. We, however, are disinclined to believe that the proposal was necessarily intended to limit acceptance to that form. But subsequent correspondence reveals that the defendant did not intend to accept all the conditions of the plaintiffs' letter of August 4th, particularly with reference to inspection. It reveals further, in our judgment, that the plaintiffs did not consider the reply as an unqualified acceptance. In these circumstances the district judge properly refused to construe the reply as an acceptance. Most of the subsequent correspondence relates to the dispute as to inspection; the plaintiffs attempting to assert that defendant was bound to accept inspection at destination, and the defendant refusing so to do. As a matter of fact, the plaintiffs did inspect and accept 31,500 staves in October, two-thirds of which had been at the railway since April, and 64,500 staves in December, although just how these deliveries came about is not disclosed, as the plaintiffs were still asserting their rights under the alleged supplemental agreement. In January, 1921, the plaintiffs, failing to induce the defendant to agree to their conditions, notified the defendant that they would cancel the contracts and hold him for damages.

For the reasons stated, we are of opinion that the plaintiffs failed to show that they fulfilled their obligations under the contracts as to inspection, and that the direction of a verdict in favor of the defendant by the court below was therefore not error. While the defendant may not have had a right to require from the plaintiffs $5 per thousand in addition to the contract price except by agreement with the plaintiffs, yet because of plaintiffs' default defendant was within his rights in saying that he would not continue deliveries under the contracts unless plaintiffs paid the additional price requested on the staves not yet hauled. Defendant's willingness to deliver and his actual delivery of some of the staves at the old price was not a waiver of any of his rights.

Nor do we find any error in the refusal of the court below to grant a new trial. One ground on which a new trial was urged was that the plaintiffs were prevented from introducing rebuttal evidence by which it would have been shown that defendant could have made delivery in 1920. But, as the trial judge pointed out, the question involved was not so much whether the defendant could have made delivery as it was whether he was obliged to make delivery in view of plaintiffs' failure to make prompt inspection.

Another ground on which a new trial was urged was that there was newly discovered evidence to the effect that defendant had hauled away and sold the staves covered by the bills of sale. But the alleged conversion is not asserted to have taken place prior to the refusal of the plaintiffs to go on with the contracts. Such alleged conversion after the contracts had been terminated would not appear to enlarge or diminish the alleged claim of the plaintiffs for damages for breach of contract.

Neither the property rights of the respective parties in the staves nor the accounts existing between the parties arising out of the partial performance of the contracts are determined by the dismissal of the plaintiffs' action for damages for breach of contract. The verdict establishes merely that the defendant did not break the contracts; it does not adjudicate the rights of the parties in the staves; the extent, if any, to

which the defendant is entitled to a vendor's lien for the unpaid purchase price or for damages for the nonfulfillment of the contracts; or the balance that may be due as between the parties on an accounting in relation to the transactions arising out of the contracts. Nor does it adjudicate the defendant's counterclaim for damages which not being pressed after the direction of the verdict, must be regarded as withdrawn without prejudice.

Affirmed.